**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JACQUELYN O. CLEMENTS,

      Plaintiff,

v.                                                                             No. CIV 22-00062 RB/SCY

ALTO TRUST CO. and ALTO
SOLUTIONS, INC. (d/b/a ALTOIRA),

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants' Alto Trust Co. and Alto Solutions, Inc. (collectively, Alto) Motion to Compel Arbitration under Section 4 of the FAA. (Doc. 62.) Alto argues that Plaintiff Jacquelyn Clements electronically signed a clickwrap agreement that included a valid arbitration provision and that her claims in this lawsuit fall within the scope of that provision. It also argues that under the agreement's delegation clause, an arbitrator must determine issues of arbitrability.

Clements contends that she is not bound by an arbitration agreement because there is no valid and enforceable contract between the parties, or alternatively, because the arbitration provision itself is unconscionable. (Doc. 66.)

For the reasons outlined in this Opinion, the Court finds that the parties formed an enforceable contract with an arbitration agreement, but the agreement's delegation clause did not clearly and unmistakably delegate arbitrability issues to an arbitrator. Although the Court finds in Alto's favor on the issue of the contract's validity, the Court will deny the motion without prejudice and order further briefing as outlined in this Opinion.

I.      **Factual Background**[1]

A.      **Alto became the Lending Club Corporation's "preferred" custodian.**

In 2020 Plaintiff Jacquelyn Clements, "an unsophisticated consumer" and citizen of Texas, opened a Traditional Individual Retirement Custodial Account (the "Lending Club IRA") with the Lending Club Corporation (Lending Club). (Doc. 59 (TAC) ¶¶ 1, 4–5.) Forge Trust served as the original custodian of Clements's Lending Club IRA. (*Id.* ¶ 6.) Sometime between March 3, 2021, and April 12, 2021, the Lending Club instituted "an opt-out period . . . for Lending Club IRA holders to decide whether they wanted to remain with their custodian" or transition to using Defendant AltoIRA (Alto),[2] Lending Club's "new preferred custodian." (*Id.* ¶ 7.) "The opt-out period ended on April 21, 2021 . . . ." (*Id.* ¶ 8.)

B.      **Alto made documents available to account holders.**

During the opt-out period, Alto made several documents available to account holders relevant to the changeover. (*See id.* ¶¶ 9–21.) The documents included: (1) a Form 5305-A for traditional IRAs (the "Form 5305-A"); (2) a Custodian Agreement[3]; (3) an undated version of a Terms of Service document that was available through April 15, 2021 (the "undated TOS"); (4) a second version of a Terms of Service document dated April 16, 2021 (the "April 16, 2021 TOS"); (5) a Custodian Account Agreement (CAA) dated November 2019 that was available through April

---

[1] The Court recites the facts relevant to this motion as they are derived from the Third Amended Complaint (Doc. 59 (TAC)) and construes them in a light most favorable to Plaintiff, the non-moving party.

[2] Defendant Alto Trust is the named custodian of Clements's Lending Club IRA. (TAC ¶ 1.) "Alto Trust delegated to AltoIRA certain administrative functions of the custodian with respect to [Clements's] Lending Club IRA." (*Id.*) Because the parties refer generally to Alto Trust and AltoIRA as "Alto," the Court will do the same.

[3] The Form 5305-A and the Custodian Agreement were combined into one document, with the Form 5305-A numbered pages 1–2 and the Custodian Agreement numbered pages 3–13. (TAC ¶ 9; Doc. 59-1.) The Court will refer to the entire document together as the Combined 5305/Custodian Agreement.

15, 2021 (the "November 2019 CAA"); and (6) a second version of a CAA dated April 16, 2021 (the "April 16, 2021 CAA").[4] (*Id.* ¶¶ 9–19; *see also* Docs. 59-1–59-4.)

Sometime between April 12, 2021, and April 15, 2021, the "Lending Club directed [Clements] to [Alto's] general website, where" Clements read the Combined 5305/Custodian Agreement, the November 2019 CAA,[5] and the undated TOS. (TAC ¶¶ 34–35.) Clements emphasizes that the Combined 5305/Custodian Agreement contained the words "Custodian Agreement" on pages 3 and 13 and did *not* contain the words "Custodian Account Agreement." (*Id.* ¶¶ 10, 38; *see also* Doc. 59-1.) Similarly, neither version of the CAA contained the words "Custodian Agreement," but were both labeled "Custodian Account Agreement." (TAC ¶¶ 36–37; Docs. 59-3–59-4.) The CAAs, but not the Combined 5305/Custodian Agreement, contained an Arbitration Agreement. (*See* TAC ¶ 40; *see also* Docs. 59-1; 59-3–59-4.)

None of the documents Clements read prior to April 16, 2021, were labeled "draft" or otherwise indicated that they were subject to change. (TAC ¶ 41.) Defendants drafted all documents, and Clements had "no opportunity to negotiate or change . . . their terms." (*Id.* ¶ 42.)

### C.    Clements executed a clickwrap agreement.

On April 23, 2021, Clements executed a clickwrap agreement[6] that contained the following text:

---

[4] Alto replaced the April 16, 2021 CAA with another version on August 25, 2022. (TAC ¶ 19.)

[5] Clements asserts in her Third Amended Complaint that she read the November 2019 CAA (TAC ¶ 35), but vacillates in a later affidavit and states that she "cannot recall which version of the [CAA] (November 2019 or April 16, 2021) [she] read during the opt-out period . . . ." (Doc. 66-1 ¶ 6.)

[6] A clickwrap agreement is "an agreement that appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction." *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183, 1190 (D.N.M. 2018) (citation and quotation marks omitted).

By signing below you confirm that you have read, understand, and agree to the <u>Custodian Agreement</u> and that you have received the Form 5305 (<u>Form 5305-Roth</u>, <u>Form 5305- Traditional</u>, or <u>5305 SEP</u>) and the <u>Gramm Leach Bliley</u> notice. You understand that you are directing AltoIRA, Administrator, to establish a new self-direct IRA account(s) consistent with the accounts listed above, held at your prior custodian(s.) . . . .

(*Id.* ¶ 44; Docs. 62-1 ¶ 14; 62-1 at 26.) "All underlined terms were hyperlinked . . . ." (TAC ¶ 45.) The hyperlink connected to the "Form 5305-Traditional" took "consumer[s] to the Combined 5305/Custodian Agreement." (*Id.* ¶ 46.) The hyperlink connected to "Custodian Agreement" was mislabeled, because it took consumers to the April 16, 2021 CAA, not to the Custodian Agreement that was packaged with the Form 5305-A. (*See id.*)

Clements asserts that she "executed the clickwrap agreement without knowledge or a reasonable opportunity to obtain knowledge of the character or essential terms of what was in fact (but deceptively labeled) the [April] 16, 2021 CAA." (*Id.* ¶ 47.) Clements did not "provide an electronic signature directly on any version of the [CAA], the Custodian Agreement, or the Form 5305-A." (*Id.* ¶ 55.) Instead, she electronically signed underneath the statement with the incorrectly named hyperlinks. (*See id.* ¶ 44; *see also* Doc. 62-1 at 26.) Clements "indicated acceptance to the clickwrap statement electronically because she had already complied with her literal reading of it just days earlier . . . and did in fact agree to the correctly-titled [Combined 5305/Custodian Agreement]." (TAC ¶ 48.) She asserts that she "had no reason to think that either document had changed from what she read just days before . . . ." (*Id.* ¶ 49.) Clements "denies ever agreeing to any Custodian Account Agreement." (*Id.* ¶ 51.)

**D.     The differences between the arbitration provisions in the CAAs.**

Both versions of the CAA contained an arbitration agreement. (*See id.* ¶ 20; Doc. 59-5.) Clements points to three differences between the two arbitration agreements that she alleges are

key to this lawsuit: (1) the November 2019 CAA provides that the parties will arbitrate in New York, while the April 16, 2021 CAA provides that the parties will arbitrate in Nashville, Tennessee; (2) the November 2019 CAA provides that an arbitration proceeding will "be conducted by a panel of three neutral arbitrators," while the April 16, 2021 CAA provides that arbitration will "be conducted by a panel of three arbitrators selected pursuant to the AAA rules"; and (3) the November 2019 CAA states that neither party can pursue a class action or consolidated arbitration, while the April 16, 2021 CAA states that only Defendants may pursue a class action or consolidated arbitration. (*See* TAC ¶ 26; Docs. 59-3–59-4.)

### E.    Clements filed a demand for arbitration and later filed this lawsuit, seeking declaratory judgments in four counts.

On August 20, 2021, Clements filed a demand for arbitration with the American Arbitration Association (AAA). (*See* Doc. 28-1 at 2.[7]) She asserts that she filed the demand because of the "confusing and intimidating Arbitration Provision" and to "avoid being held liable for Defendants' legal fees, costs, and expenses [if they succeeded in filing] a motion to compel arbitration . . . ." (TAC ¶ 27.) "Once Clements filed her arbitration demand, the AAA required [Alto] to register the Arbitration Agreement with the AAA under its Consumer Arbitration Rules" and "to waive the mandatory nature of the (a) prevailing-party fee provision and (b) Nashville hearing location under its Arbitration Agreement . . . ." (Doc. 62-1 ¶ 16; *see also* Doc. 13-1 at 2.)

On October 8, 2021, Clements emailed Alto and the AAA Case Administrator and stated that unless Alto agreed to strike the arbitration agreement and provide certain remedies, Clements would file suit in federal court. (Doc. 13-4 at 2.) On October 12, 2021, Alto responded and declined to comply with Clements's demands. (Doc. 13-5 at 2–3.) On October 13, 2021, the AAA Case

---

[7] The Court will refer to exhibits using the CM/ECF numbering and pagination.

Administrator sent correspondence to the parties and stated that the issue "is a threshold issue, which must be determined by an administrator." (Doc. 13-6 at 2.) Without "an agreement by the parties or a court order staying [the] matter, the AAA [would] proceed with the administration of the arbitration." (*Id.*) In a separate letter sent on October 13, 2021, the AAA determined that any arbitration hearings in the matter would be held in Fredericksburg, Texas. (Doc. 13-3 at 2.)

The AAA held a conference call with the parties on January 4, 2022, and entered a scheduling order on January 6, 2022, setting an evidentiary hearing in September 2022. (*See* Doc. 13-7 at 2.) During the call, Clements's attorney "refused to allow the panel to determine arbitrability and enforceability issues and promised opposing counsel and the panel that a judicial action was forthcoming." (Doc. 22-2 ¶ 14.) Alto asserts, and Clements does not deny, that she submitted five arbitration demands in the AAA proceedings: one original demand and four amended demands. (*See* Doc. 62 at 11; *see also* Docs. 28-1 at 2–8 (original); 28-4 at 2–11 (first amended); 28-5 at 2–20 (second amended) 28-6 at 2–23 (third amended); 22-2 at 27–52 (fourth amended).[8]) Each demand said "Demand for Arbitration – Consumer Arbitration Rules." (*See* Docs. 28-1 at 4; 28-4 at 2; 28-5 at 2; 28-6 at 2; 22-2 at 27.) In her fourth amended demand,[9] Clements "reserved" the issues of arbitrability and enforceability for decision by the Court and objected to the AAA Panel's jurisdiction over any such issue. (*See* Doc. 22-2 at 29.) Clements also sought to suspend the arbitration proceedings pending this lawsuit. (*See id.*)

Clements filed this lawsuit on January 27, 2022. (Doc. 1.) She filed her Third Amended Complaint on December 21, 2022. (TAC.) Clements seeks the following declaratory judgments in

---

[8] The Arbitration Demands are not dated.

[9] Alto asserts that Clements filed her fourth amended demanded on February 14, 2022, after she filed this lawsuit. (*See* Doc. 62 at 11.)

Counts 1–4: (1) **<u>Count 1</u>**: that her electronic signature on the clickwrap agreement was procured via fraud in the execution because the hyperlink text linked to "Custodian Agreement" took consumers to the April 16, 2021 CAA (*id.* ¶¶ 28–59); (2) **<u>Count 2</u>**: that her electronic signature was procured via fraud in the execution because Defendants "quietly substituted" the April 16, 2021 CAA for the previously published November 2019 CAA (*id.* ¶¶ 60–73); (3) **<u>Count 3</u>**: that the issue of arbitrability is properly before the Court and may not be decided by an arbitrator (*id.* ¶¶ 74–99); and (4) **<u>Count 4</u>**: that the April 16, 2021 CAA is void or voidable as unconscionable and unenforceable (*id.* ¶¶ 100–36).

## II.     Legal Standards

"An arbitration agreement is a contract or a provision in a contract whereby parties agree to 'settle by arbitration a controversy . . . arising out of such contract or transaction." *Laurich v. Red Lobster Rests., LLC*, 295 F. Supp. 3d 1186, 1202 (D.N.M. 2017) (quoting 9 U.S.C. § 2). "Both federal and New Mexico law reflect a public policy in favor of arbitration agreements." *Id.* (citing *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1488–89 (10th Cir. 1994) ("There is a strong federal policy encouraging the expeditious and inexpensive resolution of disputes through arbitration."); *United Tech. & Res., Inc. v. Dar Al Islam*, 846 P.2d 307, 309 (N.M. 1993) ("The legislature and the courts of New Mexico 'have expressed a strong policy preference for resolution of disputes by arbitration.'")). "The Federal Arbitration Act ('FAA') permits a party to move the Court to compel arbitration of issues covered by a valid arbitration agreement." *Waltrip v. Pilot Travel Ctrs.*, No. CV 21-642 GBW/KRS, 2022 WL 2192892, at *2 (D.N.M. June 17, 2022) (citing 9 U.S.C. § 4). "Substantively, the movant must show that (i) the parties formed an agreement to arbitrate; and (ii) their dispute falls within that agreement's scope." *Id.* (citing

*Soc'y of Pro. Eng'g Emps. in Aerospace v. Spirit AeroSystems, Inc.*, 681 F. App'x 717, 721 (10th Cir. 2017)).

Issues regarding contract "[f]ormation 'must always be decided by a court.'" *Id.* (quoting *Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1105 (10th Cir. 2020)); *see also Laurich*, 295 F. Supp. at 1205–06; *Avedon Eng'g Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997); *K.L. House Constr. Co.*, 576 P.2d at 754 ("[T]he courts only decide the threshold question of whether there is an agreement to arbitrate. If so, the court should order arbitration.")). "To be enforceable, an arbitration agreement must be validly formed pursuant to state contract law principles—e.g., the arbitration agreement must not be illusory or unconscionable." *Laurich*, 295 F. Supp. at 1202 (citing *Salazar v. Citadel Comm'ns Corp.*, 90 P.3d 466, 469 (N.M. 2004) ("[t]o determine whether the agreement to arbitrate is valid, courts look to general state contract law")).

"Courts also decide arbitrability—i.e., whether the parties' dispute falls within the scope of their arbitration agreement—unless there is 'clear and unmistakable evidence' that the parties agreed to delegate this issue to the arbitrator." *Waltrip*, 2022 WL 2192892, at *2 (citing *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017)). "Arbitrable disputes include not only the interpretation of an agreement's scope but also gateway issues such as the agreement's enforceability as a matter of public policy." *Id.* (citing *Fedor*, 976 F.3d at 1106).

The Court treats a motion to compel much like it does a motion for summary judgment:

> the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; if it does so, the burden shifts to the nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith.

*Id.* (quoting *BOSC, Inc. v. Bd. of Cnty. Comm'rs of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017)). "[E]vidence need not be submitted in a form that would be admissible at trial but its content

or substance . . . must be admissible." *Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)) (quotation marks omitted).

"Viewing the evidence in the light most favorable to the party opposing arbitration, the Court takes a 'quick look' at the record to determine whether a genuine issue of material fact exists." *Id.* (quoting *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014)). "If a genuine dispute of material fact exists, the Court proceeds to a summary trial to clarify the facts." *Id.* (citing *Howard*, 748 F.3d at 978). "Otherwise, the Court resolves the two-part inquiry as a matter of law without trial." *Id.* (citing *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012)).

## III.   Analysis

The Court finds first that Clements did not waive her right to file this lawsuit by first filing an arbitration demand. The Court further finds that the parties entered into a valid contract that encompasses the April 16, 2021 CAA. The Court holds that the CAA's delegation clause does not contain clear and unmistakable language reserving arbitrability issues to the arbitrator; thus, the Court must determine issues of arbitrability. Finally, because the parties inadequately briefed issues related to unconscionability, the Court will order supplemental briefing.

### A.   Clements did not waive her right to bring this lawsuit.

Before turning to the substance of this dispute, the Court will examine Alto's contention that Clements waived her right to file this lawsuit by filing an arbitration demand and participating in the arbitration process for approximately five months. (*See* Doc. 62 at 17.) Alto argues that by initiating and pursuing arbitration with the AAA before filing this lawsuit, Clements waived any objection to arbitration and consented to arbitration by conduct. (*Id.* at 17–18.) Alto relies on *Cordova-Baldonado v. Ultramar Diamond Shamrock Corp.*, No. CV 99-0147 JC/JHG, 1999 WL

35809475 (D.N.M. June 9, 1999), in support.

In *Cordova-Baldonado*, the plaintiff initiated arbitration proceedings in September 1997, asked for an arbitration location, paid the processing fee, and attended a September 1998 management conference with an arbitrator, counsel, and the AAA case manager, where the case manager scheduled the exchange of position papers and set an arbitration date. *Id.* at *1. The defendant submitted its paper, but the plaintiff did not. *Id.* Over a year after initiating arbitration and approximately seven weeks prior to the scheduled arbitration, the plaintiff gave notice that she did not wish to proceed. *Id.* The AAA closed its case file. *Id.* The plaintiff filed suit in federal court, and the defendant sought to enforce the arbitration agreement. *See id.* at 2. The court found that the plaintiff's conduct in retaining counsel, paying the AAA's processing fee, initiating arbitration, and actively pursuing arbitration demonstrated "that she agreed to be bound by the arbitration agreement." *Id.* at *3.

The Court declines to follow *Cordova-Baldanado* for two reasons. First, the circumstances here present a much shorter timeframe from the time Clements initiated arbitration to the time that she raised the issue of the validity of the arbitration agreement and stated her intent to file a lawsuit. It is true that Clements initiated arbitration, filed several amended arbitration demands, and attended a conference call with the AAA administrator who set an evidentiary hearing; yet Clements first raised the issue of filing a lawsuit only two months after she filed her first arbitration demand. (*See* Doc. 13-4 at 2.) Moreover, Clements filed suit approximately five months after initiating arbitration (*see* Doc. 28-1 at 2), whereas the *Cordova-Baldanado* plaintiff waited over one year to withdraw from an impending arbitration proceeding and file suit.

Second, Clements cites Tenth Circuit authority that post-dates *Cordova-Baldonado* and is instructive. In *Lewis v. Circuit City Stores, Inc.*, the plaintiff initiated arbitration and proceeded

until the arbitrator returned a decision. 500 F.3d 1140, 1144, 1148 (10th Cir. 2007). He later filed suit and argued that the arbitration agreement "was unenforceable as a matter of basic contract law." *Id.* at 1148. The Tenth Circuit found that "a party's failure to raise a question of the enforceability of an arbitration agreement, followed by the party's participation in arbitration, effectively waives that party's right to object to arbitration." *Id.* at 1149. The *Lewis* court found it critical that the plaintiff had not "forcefully object[ed] to the" proceedings or made any "explicit statement objecting to the arbitrability of the dispute . . . ." *Id.* at 1148–49 (discussing *First Options of Chicago Inc. v. Kaplan*, 514 U.S. 938, 946 (1995); *AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000)) (subsequent citations omitted). And as the plaintiff "conceded that he had not expressly challenged the enforceability of the agreement during arbitration[,]" but only generally objected to "having to arbitrate," the court found the record "devoid of an objection to any legal aspect of the arbitration agreement or to the enforceability of the agreement generally." *Id.* at 1150. The Tenth Circuit held that "[b]ecause Lewis never adequately objected in arbitration to the arbitrability of his claims or raised a question as to the validity of the arbitration agreement, he waived his opportunity to do so and is estopped from raising such issues" in court. *Id.*

Here, Clements filed her original arbitration demand on August 20, 2021, and first raised objections to the Arbitration Agreement via an email to Alto and the case administrator on October 8, 2021. (*See* Docs. 13-4 at 2; 28-1 at 2.) She later raised the issues of arbitrability and enforceability for decision by the Court and objected to the AAA Panel's jurisdiction during the parties' case management conference call and in her fourth amended demand. (*See* Doc. 22-2 ¶ 14 & 29.) She filed suit in January 2022, five months after initiating arbitration. Under these circumstances, the Court finds that Clements's forceful, repeated, and explicit objection to the arbitrator's authority to decide arbitrability was adequate to preserve her opposition and proceed

with her lawsuit without a waiver. Having rejected Alto's waiver argument, the Court turns to the issues of whether the parties' contract is enforceable.

**B.    The parties entered into a valid contract.**

Considering the facts in a light most favorable to Clements, the Court finds that the parties' contract is binding. "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked." *Waltrip*, 2022 WL 2192892, at *3 (quoting *Avedon Eng'g, Inc.*, 126 F.3d at 1287). "To determine whether such an agreement exists, the Court 'appl[ies] ordinary state-law principles that govern the formation of contracts.'" *Id.* (quoting *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006)). "For a contract to be legally valid and enforceable, it must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Flemma v. Halliburton Energy Servs., Inc.*, 303 P.3d 814, 822 (N.M. 2013) (quotation and quotation marks omitted). At issue here is whether Alto can establish Clements's mutual assent to the April 16, 2021 CAA.

"To determine whether a clickwrap agreement is enforceable, courts presented with the issue apply traditional principles of contract law and focus on whether the plaintiffs had reasonable notice of and manifested assent to the clickwrap agreement." *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183, 1190 (D.N.M. 2018) (quotation omitted) (citing *Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012)). "Courts evaluate whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms." *Hancock*, 701 F.3d at 1256 (citations omitted).

12

1.      **The agreement's terms were clearly presented, and Clements had an opportunity to read them.**

Clements centers her position around whether the terms of the contract were clearly presented, because the hyperlink for the CAA was mislabeled. She argues that because the hyperlink labeled "Custodian Agreement" linked to the April 16, 2021 CAA, there can be no "objective manifestation of mutual assent" to establish "that the parties agreed to the . . . separate and unmentioned [CAA]." (Doc. 66 at 12–13 (citing *Pope v. Gap, Inc.*, 961 P.2d 1283, 1286–87 (N.M. Ct. App. 1998)).)

"Mutual assent is based on objective evidence, not the private, undisclosed thoughts of the parties." *Pope*, 961 P.2d at 1287 (citing *Trujillo v. Glen Falls Ins. Co.*, 540 P.2d 209, 211 (N.M. 1975); *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 868 P.2d 1266, 1277–78 (N.M. Ct. App. 1993) (Hartz, J., dissenting)). Alto argues that Clements's electronic signature to the clickwrap agreement, affirming her agreement to be bound by the hyperlinked (though misnamed) documents, is sufficient to show objective evidence of her mutual assent. (*See* Docs. 62 at 17; 62-1 at 26.) Alto argues that regardless of whether it was mislabeled, Clements admits that the hyperlink led to the April 16, 2021 CAA, and thus she had an opportunity to read the correct document at the time she executed the clickwrap agreement. (*See* Doc. 67 at 3.)

The Court agrees with Alto and finds the case of *Davis v. USA Nutra Labs* instructive. To complete an online purchase, the *Davis* plaintiff "was required to click a button that said 'Complete Order,' directly below which was a sentence stating: '[b]y clicking Complete Order I accept the Terms and Conditions . . . .'" 303 F. Supp. 3d at 1190 (quotation marks omitted). "The phrase 'Terms and Conditions'[10] contained a hyperlink that allowed [the p]laintiff, by clicking on that

---

[10] Clements incorrectly asserts that "there was correct symmetry between link text and linked document in *Davis*." (Doc. 66 at 18.)

phrase, to access" a document that contained the arbitration agreement. *Id.* The conspicuously linked document was titled "Terms of Service" and read in part: "In order to use our Site . . , you must agree to our Terms of Use . . . ." *See id.* at 1187; *see also* 1:15-cv-1107 MV/SCY, Doc. 24-3 at 1 (D.N.M. Feb. 12, 2016). Although the labeling of the hyperlinks was not at issue, the court found "[a] reasonably prudent internet user would have known of the existence of the terms in [the] Terms of Use, . . . including the arbitration provision." *Id.* at 1191 (citation omitted).

The same is true here. The clickwrap agreement contained conspicuous hyperlinks that took consumers to two documents: the Combined 5305/Custodian Agreement and the April 16, 2021 CAA. (*See* Doc. 62-1 at 26.) Clements does not argue, and there is no basis to find, that she was unable to see or click on the hyperlinks. Consequently, a reasonably prudent internet user would have known to follow the links and read the documents to which they were agreeing. *See Davis*, 303 F. Supp. 3d at 1190–91 (citing, *e.g.*, *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 840–41 (S.D.N.Y. 2012) (enforcing a forum selection clause that could be viewed only by following a hyperlink and reasoning that "[a] reasonably prudent offeree would have noticed the link and reviewed the terms before clicking on the acknowledgment icon")).

Clements contends that the mislabeled hyperlink was insufficient to "incorporate by reference" the CAA into the contract. (Doc. 66 at 13.) Clements's argument is off base. The rule on incorporating extrinsic materials by reference into a contract is relevant to documents that are referenced—but not attached—to a contract. *See, e.g.*, *Summit Elec. Supply Co. v. Int'l Bus. Machines Corp.*, No. 1:07-CV-0431 MCA/DJS, 2009 WL 9087259, at *8 (D.N.M. Sept. 30, 2009) (noting that to show that a document was incorporated into a contract by reference, the party "must demonstrate that, when executing the [contract], the parties effectively incorporated a document that was neither attached nor executed contemporaneously with the [contract]"). Here, the CAA

was "attached," as it was hyperlinked to and thus directly accessible from the statement Clements signed. The cases Clements relies on are all distinguishable on this basis. (*See* Doc. 66 at 13–14.[11])

Clements argues that mutual assent is shown by the parties' "objective manifestations," and not by their "secret intentions." (Doc. 66 at 12 (quoting *Pope*, 961 P.2d at 1287).) She contends that Alto secretly intended "to bind [her] to a different agreement hidden behind the 'Custodian Agreement' [hyper]link . . . ." (*Id.* at 13.) *See id.* But the linked document was not a secret. The hyperlink was conspicuous, working, and it took Clements to the April 16, 2021 CAA. Clements had ample opportunity to read the linked document.

Where Clements signed the clickwrap agreement and manifested her intent to be bound by the linked documents, it is unclear why the contract should be stymied by Clements's own secret reservations about the arbitration provision. In sum, the Court finds that a reasonably prudent internet user would have clicked on the hyperlinks to read the terms before agreeing to them. Despite the misnamed hyperlink, the terms of the contract were clearly presented and Clements

---

[11] Clements cites, for example: *Holmes v. Colo. Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1209–10 (10th Cir. 2014) (assuming without deciding that an insurance plan's summary plan description incorporated by reference a claim denial review procedure where it stated that a claimant would receive written notice if a claim was denied); *Bio-Med. Applications of Tex., Inc. v. Med. Mgmt., P.A.*, 198 F. Supp. 2d 849, 852 (E.D. Tex. 2002) (finding that an amendment to a lease agreement specifically incorporated the "separate, noncontemporaneous document") (quoting 11 Richard A. Lord, Williston on Contracts § 30.25 (1999)). (*See* Doc. 62 at 17.)

Clements highlights the decision in *Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401, 424 (D.N.J. 2018), *aff'd*, 959 F.3d 590 (3d Cir. 2020), where the court found that a document (the "rental jacket") was not adequately incorporated by reference into the parties' contract. (Doc. 66 at 13–14.) The court found that a "customer could not readily infer what document" the contract referenced as the sales associate, by design, "did not hand the customer the Rental Jacket until after the customer had signed the" contract. *Bacon*, 357 F. Supp. 3d at 418. "To add to the confusion, the document referred to as the 'rental jacket' is not titled 'Rental Jacket[,]' but instead "bears the title 'Rental Terms and Conditions.'" *Id.* Clements seizes on this fact and argues that "a document correctly titled 'Rental Terms and Conditions' could not properly be incorporated by reference when incorrectly referred to as 'rental jacket' in *Bacon*." (Doc. 66 at 18.) *Bacon* is not on point, however, because Clements had the opportunity to click on the mislabeled hyperlink to read the relevant provisions of the contract she was signing.

had an opportunity to read them.

### 2.      Clements manifested an unambiguous acceptance of the terms.

Trying a different tack, Clements argues that she did not accept the terms of the contract because Alto committed "fraud in the execution" when it misnamed the hyperlink. (*See* Doc. 66 at 15–18.) "Fraud in the execution occurs if 'misrepresentation of the character of essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract.'" *Perez v. Colleen Fry Tafoya, Kayjes, Inc.*, No. CV 01-1364 DJS/RLP, 2002 WL 35649985, at *4 (D.N.M. May 22, 2002) (quoting Restatement (Second) of Contracts § 163 (1981)[12]). Clements fails to allege facts sufficient to maintain a fraud-in-the-execution defense.

Clements contends that by putting the CAA behind a hyperlink misnamed "Custodian Agreement," Alto fraudulently induced her to sign the clickwrap agreement. (*See* Doc. 66 at 16.) She cites to *Nature's Sunshine Products, Inc. v. Kumets*, where the court "held that using fake names in a contract was a material and essential term, and voided the contract." (*Id.* at 15 (citing No. 2:20-cv-658, 2021 WL 1293327, at *5 (D. Utah Apr. 7, 2021)).) Clements fails to explain, however, that the contract in *Nature's Sunshine* specified that the "Member Agreement is void if any member of the same family unit had previously executed a separate Member Agreement." *See* 2021 WL 1293327, at *4. Thus, when the defendant son executed a member agreement after another member of his "family unit" had previously executed a separate member agreement, the latter agreement was void under the terms of the contract. *See id.* at *5. *Nature's Sunshine* does

---

[12] Restatement (Second) of Contracts § 163 provides:

    If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent.

not control the outcome here.

Clements offers several other cases to support her fraud-in-the-execution defense, but they all share two elements that she is unable to show: (1) that the parties agreed to one contract provision and then one party secretly substituted a different provision; and (2) that the second party can show "excusable ignorance" of the substituted provision. (*See* Doc. 66 at 16–17.) In *Connors v. Fawn Mining Corp.*, for example, an employer (Fawn Mining) and a union negotiated a collective bargaining agreement (CBA). 30 F.3d 483, 485–87 (3d Cir. 1994). Fawn Mining agreed to the CBA on the condition that the employer would not be required to contribute to a pension benefit plan. *Id.* at 486–87. When the parties signed the CBA, they were presented with a single, unattached signature page. *Id.* at 487. The Fawn Mining representative signed the CBA under the belief that the CBA did not require the employer's contribution to the plan. *See id.* at 487. In fact, the CBA *did* require that Fawn Mining contribute to the plan, and the plan later sued for missed contributions. *See id.* at 487–88. Fawn Mining's defense on "summary judgment was that it had been affirmatively led . . . to believe that the agreement it was signing did not require it to contribute to the [p]lan at any time." *Id.* at 489. The Third Circuit found that Fawn Mining successfully asserted the "defense of fraud in the execution, which, if proven, would be a valid defense to the [plan's] claims." *Id.* at 492. The court noted that "[t]o prevail on a defense of fraud in the execution, a party must show 'excusable ignorance of the contents of the writing signed." *Id.* at 491 (quotation marks and citation omitted). *Fawn Mining* is distinguishable, both because Clements fails to allege facts to show that she and Alto agreed on her undisclosed, alternative understanding of the contract terms, and because Clements cannot show "excusable ignorance" of a document that was available for her to read at the hyperlink.

The three other cases Clements discusses are similarly unavailing. In *Hetchkop v.*

*Woodlawn at Grassmere, Inc.*, the court found that the defendant successfully asserted a fraud-in-the-execution defense where it alleged facts to show that the parties discussed and agreed on a contract in which the defendant had only a "limited obligation," and that later the plaintiff, without the defendant's knowledge, had "fraudulently substituted" a different agreement with an unlimited obligation. 116 F.3d 28, 29, 34 (2d 1997). In *MZM Construction Company, Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, the allegations showed that the parties, who had worked together in the past, "reached an oral understanding on a single-project agreement with no mention of an arbitration provision . . . ." 974 F.3d 386, 404 (3d Cir. 2020). The court emphasized the parties' relationship and that the defendant "had good reason to trust and rely on" the oral representations. *Id.* at 405. On those facts, the court found the allegations sufficient "to state a claim for fraud in the execution . . . by reason of excusable ignorance." *Id.* Finally, in *Axalta Coating Systems, LLC v. Midwest II, Inc.*, the parties discussed and agreed to a contract that contained an express warranty because the defendant stated (and the plaintiff knew) that the contract "was a 'no go' without this term . . . ." 217 F. Supp. 3d 813, 816–17, 822–23 (E.D. Penn. 2016). The defendant alleged that before signing, the plaintiff "surreptitiously substituted" the contract for one without an express warranty. *See id.* at 822. The difference between *Axalta* and the two cases above is that in *Axalta*, the defendant had time to read and review the agreement before signing it but, trusting that the contract had not changed, declined to re-read it. *See id.* at 822–23. The court held that under Pennsylvania state precedent, "a party claiming fraud in the execution is under no duty to read a contract allegedly procured by fraud to confirm its contents unless the fraud is known or obvious; otherwise the failure to do so will not preclude [the party] from establishing justifiable reliance." *Id.* at 823 (quotation marks and citation omitted).

Neither *Hetchkop*, *MZM*, nor *Axalta* help Clements, as she fails to allege facts to show that

she and Alto ever discussed or agreed on alternative contract provisions before she signed the clickwrap agreement. Nor does she allege facts to show excusable ignorance, as she had time and opportunity to click on the hyperlink and read the relevant documents, but she did not.

Finally, Clements summarily argues in a footnote that Alto committed fraud in the execution by switching the November 2019 CAA with the April 16, 2021 CAA "just days" before the end of the opt-in period. (*Id.* at 18 n.19.) The Court disagrees. Alto made that change seven days before the end of the opt-in period, and it made the document available to consumers via the hyperlink at signing. This was not a last-minute switch, as happened in the cases Clements relies on to support her fraud-in-the-execution defense.

Even if the Court were to find that the unannounced change in the CAAs seven days prior to the end of the opt-in period was done with fraudulent intent, Clements has not demonstrated excusable ignorance for her failure to read the updated and hyperlinked document. The following facts are relevant to the Court's finding. When Lending Club notified Clements of the impending switch to Alto, she visited Alto's website and read the "various legal documents publicly" available. (Doc. 66-1 ¶ 2.) "Some of these documents seemed to potentially be applicable to [her] circumstances . . . , and some of them definitely were not." (*Id.*) "No later than April 15, 2021, [she] read the legal documents that *she thought might be applicable* to" her account, but she admits that she "*did not know what documents [she] later would be asked to agree to* out of all of the documents posted on Alto's website . . . . (*Id.* ¶¶ 2, 4 (emphasis added).) Among those documents was the November 2019 CAA, which she read "but did not fully understand or agree to it." (Docs. 66 at 1; 66-1 ¶ 2.) Despite not knowing what documents she would later be asked to sign, and despite not agreeing to at least one of the documents she read on the website, she executed the clickwrap agreement without reading the linked documents. Under these circumstances, Clements

fails to show excusable ignorance. Moreover, her electronic signature manifested her unambiguous acceptance of the contract terms.[13]

### 3.     The parties entered into a contract.

Clements protests that her affidavit, in which she "unequivocally den[ies] that she agreed to the [CAA,]" introduces a genuine dispute of material fact that requires this Court to hold a summary jury trial on the issue of her contract formation claim. (*See* Doc. 66 at 19.) The Court finds that her affidavit is insufficient to create a genuine dispute of material fact. Whether Clements understood and agreed to the April 16, 2021 CAA "is immaterial, as a party who enters into a contract 'is presumed to know the terms of the agreement, and to have agreed to each of its provisions." *Davis*, 303 F. Supp. 3d at 1192–93 (citing *Smith v. Price's Creameries, Div. of Creamland Dairies, Inc.*, 650 P.2d 825, 829 (N.M. 1982)) (subsequent citation omitted). At the end of the day, "[a] party who manifests assent to a contract's terms is bound by them, and failure to read the terms is no excuse." *Hancock*, 701 F.3d at 1256 (citations omitted); *see also Laurich*, 295 F. Supp. 3d at 1206 ("It is a fundamental tenet of contract law 'that each party to a contract has a duty to read and familiarize himself with the contents of the contract, each party generally is presumed to know the terms of the agreement, and each is ordinarily bound thereby.'") (quoting *Ballard v. Chavez*, 868 P.2d 646, 648 (N.M. 1994)). Clements had time and opportunity to read the contract's terms from the hyperlinks. She admits that she was not sure which of the legal documents available to her previously would be included, and she admits that she did not fully understand or agree to all the documents she read. Still, without investigating further, Clements electronically signed the clickwrap agreement. Construing the facts in a light most favorable to

---

[13] This Opinion disposes of Counts 1 and 2 of the Third Amended Complaint, which are based on Clements's fraud in the execution arguments. (*See* TAC ¶¶ 28–73.) The Court will, therefore, dismiss those counts *sua sponte*.

Clements, the Court finds, as a matter of law, that Clements was on notice of the arbitration provision and assented to it in executing the clickwrap agreement. *See Davis*, 303 F. Supp. 3d at 1193.

In sum, the Court finds that Alto clearly presented the clickwrap agreement's terms, Clements "had an opportunity to read the agreement, and [she] manifested an unambiguous acceptance of the terms." *See Hancock*, 701 F.3d at 1256 (citations omitted). The Court finds that the parties entered into a valid and enforceable contract.

### 4.    The Court reserves ruling on issues related to unconscionability.

Having determined that the agreement is enforceable, the Court must next analyze whether the arbitration agreement is unconscionable. To the extent that Alto argues the FAA, and not state law, determines this issue, the Court disagrees. (*See* Doc. 62 at 26–27.) New Mexico law holds that "unconscionability is an affirmative defense to contract enforcement . . . ." *Laurich*, 295 F. Supp. 3d at 1210 (quoting *Strausberg v. Laurel Healthcare Providers, LLC*, 304 P.3d 409, 412 (N.M. 2013)). "Consequently, [c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are unreasonably favorable to one party while precluding a meaningful choice of the other party." *Id.* (quoting *Dalton v. Santander Consumer USA, Inc.*, 2016-NMSC-035, ¶ 6, 385 P.3d 619, 621 (N.M. 2016)) (quotation marks omitted).

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

*Id.* (quoting N.M. Stat. Ann. § 55-2-302(1)). "The party asserting an unconscionability defense 'bears the burden of proving that a contract or a portion of a contract should be voided as

unconscionable.'" *Id.* (quoting *Dalton*, 385 P.3d at 621). "The burden of proving unconscionability refers only to the burden of persuasion, i.e., the burden to persuade the factfinder and not the burden of production, i.e., the burden to produce evidence." *Id.* (quoting *Dalton*, 385 P.3d at 621) (quotation marks omitted).

Here, Clements contends that the arbitration agreement is unconscionable on a wide variety of grounds. (*See* TAC ¶¶ 100–36; 66 at 42–51.) The parties did not, however, satisfactorily brief this issue. (*See, e.g.*, Doc. 62 at 26–27 (arguing that the FAA preempts state law on the issues Clements raises regarding unconscionability); 66 at 42 n.50 (asserting that she was unable to fully argue the issue of unconscionability "[d]ue to the page count cap")).) Thus, the Court reserves a decision on unconscionability for another day. The Court will order supplemental briefing on Count IV as outlined in the conclusion of this Opinion.

### C.    The Arbitration Provision's delegation clause is not clear and unmistakable.

After deciding formation issues, courts must decide the issue of arbitrability.[14] "The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1245 (10th Cir. 2018) (quoting *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002)) (emphasis omitted). "Often referred to as 'delegation' provisions," agreements regarding arbitrability "are separate, antecedent agreements to an arbitration agreement 'and the FAA operates on th[ese] additional arbitration agreement[s] just as it does on any other." *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1287 (D. Utah 2017) (quoting *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S 63, 70 (2010)); *see also*

---

[14] Alto asserts that Clements "does not specifically challenge the . . . delegation clause" and that she waives this argument. (Doc. 62 at 24.) The Court disagrees. (*See, e.g.*, TAC ¶¶ 74–99.)

*Dish Network*, 900 F.3d at 1245 ("Because arbitration is simply a matter of contract, [j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question who has the primary power to decide arbitrability turns upon what the parties agreed about *that* matter.") (quoting *Belnap*, 844 F.3d at 1280 (quotation marks omitted). In analyzing a delegation clause, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *Mitchell*, 280 F. Supp. 3d at 1287 (quoting *First Options*, 514 U.S. at 944). "The 'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." *Id.* (quoting *Comm'n Workers of Am. v. Avaya*, 693 F.3d 1295, 1303 (10th Cir. 2012)). "The parties may demonstrate clear and unmistakable evidence of agreement to arbitrate arbitrability by, for example, a course of conduct demonstrating assent or an express agreement to do so." *Id.* (quoting *Rent-A-Ctr.*, 561 U.S. at 79–80 (Stevens, J., dissenting)) (quotation marks and ellipses omitted). For the reasons that follow, the Court finds that the parties did not clearly and unmistakably agree to arbitrate arbitrability.

"The court begins 'its analysis by asking whether the parties did or said anything to rebut the presumption that questions about the arbitrability of an arbitration dispute will be resolved by the courts.'" *Id.* (quoting *Avaya*, 693 F.3d at 1303). Alto argues that the parties' electronic agreement to the April 16, 2021 CAA rebuts the presumption of judicial resolution. (*See* Doc. 62 at 20.) The question for the Court to determine then, is whether Clements "clearly and unmistakably agree[d] to submit threshold questions of arbitrability to the arbitrator" in the CAA. *See Mitchell*, 280 F. Supp. 3d at 1288.

Again, New Mexico law looks at whether there is objective evidence of the parties' mutual assent to the delegation clause. *See Pope*, 961 P.2d at 1287. The April 16, 2021 CAA provides:

> The parties agree that, upon the request of any party hereto, whether made before or after the institution of any legal proceeding, all claims and disputes of every type and matter which may arise between the Account Holder and the Custodian or between the Account Holder and the Administrator shall be submitted to binding arbitration before a panel of arbitrators (as described below), of and pursuant to the rules of the American Arbitration Association ("AAA") . . . .

(Doc. 59-4 at 4.) Alto asserts that according to the terms of this delegation clause, Clements agreed to delegate the gateway issue of arbitrability to the AAA panel pursuant to Rule 14 of the AAA Consumer Arbitration Rules.[15] (Doc. 62 at 20.)

Clements disagrees and points out the CAA's failure to specify "which particular set of the AAA's 57 active . . . sets of rules" Alto intended to reference. (Doc. 66 at 30.) The Court agrees—the delegation clause does not, as Alto asserts, explicitly refer to AAA's Consumer Arbitration Rules. (*See* Doc. 62 at 20–21.) Alto argues that "t]he Tenth Circuit . . . and other federal courts have held . . . that the incorporation of the relevant arbitral authority's rules into a contract constitutes 'clear and unmistakable' agreement by the parties that arbitrator(s) are provided with the authority to determine their own jurisdiction . . . ." (*Id.* at 21 (gathering cases).) Yet in almost every case Alto cites, the delegation clause specified the set of rules the parties would use. *See Dish Network*, 900 F.3d at 1242 (referencing the AAA National Rules for the Resolution of

---

[15] Rule 14, which discusses jurisdiction, provides:

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

AAA Consumer Rule, R-14(a).

Employment Disputes); *Belnap*, 844 F.3d at 1275 (specifying the JAMS rules would apply); *Border Area Mental Health v. United Behavioral Health, Inc.*, 303 F. Supp. 3d 1154, 1159 (D.N.M. 2018) (referencing the AAA Commercial Arbitration Rules); *Waltrip*, 2022 WL 2192892, at *11 (specifying the AAA Employment Arbitration Rules); *RW Dev. L.L.C. v. Cuningham Grp. Architecture, P.A.*, 562 F. App'x 224, 224 (5th Cir. 2014) (referencing the AAA's Construction Industry Arbitration Rules); *Fallo v. High-Tech Inst.*, 559 F.3d 874, 876 (8th Cir. 2009) (referencing the AAA's Commercial Rules); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009) (delegation clause referenced the AAA's Commercial Rules).[16]

There is one outlier: *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015). In *Brennan*, the court found that the delegation clause clearly and unmistakably delegated arbitrability issues to an arbitrator. *Id.* at 1130–31. Yet the *Brennan* court took pains to "limit [its] holding to the facts of the . . . case, which . . . involve[d] an arbitration agreement 'between sophisticated parties.'" *Brennan*, 796 F.3d at 1131 (quotation omitted). *Brennan* is distinguishable, as Clements was an unsophisticated consumer. (TAC ¶ 1.)

Clements cites several cases in support of a finding that the language here is not clear and unmistakable. The delegation clause in *Urbanic v. Travelers Insurance Co.* provided that arbitration would be "conducted under the auspices of the [AAA] . . . ." No. 10-CV-02368-WYD-MJW, 2011 WL 1743412, at *6 (D. Colo. May 6, 2011). The court found that although the clause "reference[d] the AAA, it [did] not expressly incorporate specific AAA Rules [or] state that the

---

[16] Alto quotes *Awuah* for the proposition that "incorporation of the AAA Rules 'is about as clear and unmistakable as language can get.'" (Doc. 62 at 22 (quoting 554 F.3d at 11).) Although the First Circuit did not quote the parties' entire delegation clause, the district court's opinion clarifies the matter: the parties delegation clause provided that "arbitration would be conducted in accordance with the "then current Rules of [the AAA] *for commercial arbitration*." 563 F. Supp. 2d 312, 315 (D. Mass. 2008), *aff'd on other grounds*, 554 F.3d 7 (1st Cir. 2009) (emphasis added). *Awuah* does not support Alto's position.

validity . . . shall be decided by the arbitrator." *Id.* Thus, the court found that there was no "clear and unmistakable" language delegating arbitrability to the arbitrator. *Id.* Examining similar language, the court reached the same conclusion in *Grosvenor v. Qwest Communications International, Inc.*, No. 09-CV-2848-WDM-KMT, 2010 WL 3906253, at *6 (D. Colo. Sept. 30, 2010) (finding the delegation clause did "not incorporate by reference the specific AAA rules, nor [did it] state that the validity of the [a]rbitration [t]erms shall be decided by the arbitrator"). In *Mitchell*, the court found that the "mere mention" of AAA rules, without specifying what set of rules would apply, was not evidence of a meeting of the minds on the issue of arbitrability. 280 F. Supp. at 1291.

Alto does not address Clements's caselaw. Instead, it asserts that almost all sets of AAA rules have delegation clauses that allow arbitrators to decide issues of arbitrability. (Doc. 67 at 8.) This argument is unpersuasive. Consumers need not be expected to comb through dozens of sets of AAA rules to decipher which apply and how. Alto also argues that Clements knew what rules applied, as her Arbitration Demands specified "Consumer Rules" in the upper right corner. (*Id.*) Of course, Clements did not file the Arbitration Demands herself; her attorney did. Alto cites no authority to show that Clements's attorney's knowledge of what AAA Rules likely apply may be used to show that Clements herself clearly and unmistakably agreed to those rules when she signed the agreement.

The Court sides with Clements on this issue. The delegation clause did not clearly and unmistakably provide that an arbitrator would decide arbitrability. Accordingly, the Court will determine issues of arbitrability.[17]

---

[17] The Court will, therefore, grant Count 3 of the Third Amended Complaint. (TAC ¶¶ 74–99.)

## IV.    Conclusion

For the reasons discussed in this Opinion, the Court finds as follows.

**Counts 1 and 2**: Alto did not procure Clements's electronic signature to the clickwrap agreement via fraud in the execution, either because the hyperlink was mislabeled or because Alto linked to the April 16, 2021 CAA instead of the previous version that it had available on its website for consumers to read. (TAC ¶¶ 28–73.) To the extent Clements seeks relief in Counts 1 and 2, the Court denies the relief and dismisses these two counts.

**Count 3**: Although the Court finds that the parties entered into an enforceable contract, the delegation clause within the CAA did not clearly and unmistakably delegate arbitrability to the arbitrator. (*Id.* ¶¶ 74–99.) The Court finds in Clements's favor on Count 3.

**Count 4**: The parties inadequately briefed the issues related to unconscionability encompassed in Count 4. (*Id.* ¶¶ 100–36.) The Court orders the parties to submit supplemental summary judgment briefing on this Count as follows:

Clements shall file a motion for summary judgment on Count 4 no later than **September 15, 2023**. Alto shall file a response brief no later than **October 16, 2023**. Clements may file a reply brief no later than **November 3, 2023**.

The parties' briefs shall comply with the page limits set forth in the Court's Local Rules. The parties may *not* incorporate by reference any argument from previous briefs. The parties must attach any exhibits they refer to in their briefs, rather than referring to the dozens of exhibits already in the record. The parties shall take care to support their arguments with citations to relevant authority, to follow this Court's rules, and to refrain from unprofessional conduct.

**THEREFORE**,

**IT IS ORDERED** that the Motion to Compel (Doc. 62) is **GRANTED IN PART** and

**DENIED IN PART** as described herein;

 **IT IS FURTHER ORDERED** that Counts 1 and 2 of the Third Amended Complaint are **DENIED**, and Count 3 is **GRANTED**;

 **IT IS FURTHER ORDERED** that the parties shall submit supplemental briefing as outlined herein.

 **IT IS FURTHER ORDERED** that Plaintiff's Unopposed Motion for Leave to File a Surreply is **GRANTED**.

 **IT IS SO ORDERED.**

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE